UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------X
Keith Bush,
     Plaintiff

       v.          Case No.:  2: 20-CV-3705

COUNTY OF SUFFOLK, Suffolk County Police  Complaint and Jury Demand
Department Detectives DENNIS RAFFERTY,
AUGUST STAHL, JOHN SHIRVELL, CONRAD
ALT, JAMES TOHILL, ALAN ROSENTHAL,
ANTHONY GAFNEY, EDWARD HALVERSON,
NICHOLAS SEVERINO, LAWRENCE
ROONEY, AND JOHN DOE officers #1-5,
in their individual capacities, and Suffolk County
Medical Examiner HAROLD ADELMAN, MD,
in his individual capacity.

     Defendants.
-------------------------------------------------------X

Plaintiff Keith Bush, by and through his attorney, Adele Bernhard, Esq., alleges as follows:


## INTRODUCTION

1. In the Spring of 1934, after a white farmer had been murdered in rural Mississippi, three

 young Black men, including Ed Brown and Henry Shields, were arrested for the crime. The

 deputy sheriff, aided by another officer and the jailer (all of whom were white), made the two

 men remove their shirts, then laid them over chairs, and commenced to whip them with a

 buckled leather strap.  Shields and Brown were told the whipping would continue until they

 confessed. When the pain became unbearable, both men confessed to the murder. The third

 Black man, Ellington, was tortured separately by the deputy and others, before he too

 confessed. They went to trial, were convicted and sentenced to death. In 1936, the United

 States Supreme Court threw out the convictions holding that confessions extorted by brutality

and violence are prohibited under the Fourteenth Amendment. *Brown v. Mississippi*, 297 US 278 (1936).

2.  Thirty-nine years after the landmark holding in *Brown*, in the early morning hours of January 11, 1975, Sherese Watson[1], a 14-year-old girl, was murdered after she left a party in Bellport, Long Island. Three days later, on nothing more than a hunch and a desire to close a case, two white Suffolk County homicide Detectives, August Stahl and Dennis Rafferty, picked up the factually innocent Keith Bush, a seventeen year old Black teenager, of slight build (5'5", 126 lbs.), with no prior involvement with law enforcement, and brought him to a windowless room in the homicide division headquarters of the Suffolk County Police for questioning. After several hours of interrogation and the Detectives' refusal to accept Mr. Bush's consistent denials or even permit him to phone his mother, Stahl and Rafferty, aided by several other officers, began to beat and terrorize Bush. The defendants pinned him down, repeatedly kicked him in his genitals and struck him numerous times on the head with a large book (like a telephone book). Like the deputy in *Brown,* Rafferty warned Bush that the torture would continue unless he signed a confession and like the young Black men in *Brown*, Bush became despondent, disoriented and desperate from the unrelenting pain and finally agreed to sign a confession.

3.  The Supreme Court in *Brown* was confronted by the twin evils of racism and torture. Perhaps that is why the Court went out of its way to include in the Opinion, the Mississippi deputy's testimony that, the torture "was not too much for a Negro; not as much as I would have done if it were left to me". When interviewed in 2019 by Assistant District Attorney Howard S. Master, the chief of the office's Conviction Integrity Bureau, retired Detective Stahl

---

[1] Ordinarily, the victim would be referred to by her initials. Here her full name is used in conformity with the relevant trial and hearing transcripts.

acknowledged his familiarity with the 44-year-old case: "Yeah I know, Keith Bush, I remember. That fucking nig**r did it." He minimized the seriousness of Black homicide victims, characterizing the murder cases he worked on in Suffolk County's communities with large Black populations as "assaults or misdemeanor homicides".

4. Stahl, like the Mississippi deputy forty years earlier, blended the twin evils of racism and brutality.  In his 2019 interview with ADA Howard, he lamented that as an older man, "I can't pound people the way I used to be able to." He asserted that when he was a Suffolk County homicide Detective, he did what he had to do to get the job done, but with the same bravado as the Mississippi deputy, he readily acknowledged, that if he engaged in that conduct today, he would be criminally prosecuted.

5. For the last twelve years, Stahl has lived in a private rural hamlet in Yaphank, founded in the 1930's and owned since by the German American Settlement League, of which he had been a board member. The private residential enclave had a restrictive covenant limiting the homes to people of Aryan German descent and remained discriminatory until a 2016 court settlement with the New York Attorney General.

6. The celebration of Juneteenth bears witness to the more than two years it took for word of the Emancipation Proclamation to reach slaves in Texas.  By 1975, when Keith Bush was arrested, the 1936 holding in *Brown* - the supreme law of the land – had not reached law enforcement in Suffolk County. It is hard to conceive of police investigatory methods more revolting to our collective sense of justice then those taken to procure a confession in this case.

7. In the 1970's and 1980's investigative journalists at the National Law Journal and Newsday and official investigations launched by the Suffolk County Bar Association and the New

3

York State Investigation Commission revealed the entrenched brutality, excessive force and structural misconduct of the Suffolk County Police Homicide Detectives. Meaningful change comes slowly. For Keith Bush, it took more than 44 years.

8. Mr. Bush was seventeen on January 14, 1975 when falsely arrested for murder and tortured by Suffolk County Detectives. He was 62 years old when finally exonerated on May 22, 2019. He spent an unimaginable 32 years in jail and in prison arrested, prosecuted and convicted of attempted sexual abuse and murder – a crime he did not commit and had absolutely nothing to do with. He was denied parole numerous times because he was unwilling to admit guilt and accept responsibility before the parole board. As Mr. Bush explains it, "I refused to let them do to me as a man what they did to me as a boy."  Finally paroled in 2007, he thereafter, for a period of 12 years, was supervised by the New York State Department of Parole and forced to register as a level three sexual offender – the most serious category. As a result of a technical parole violation, which arose from his unauthorized use of a computer to type up this painful saga, he was returned to prison for an additional eight months.

9.   On May 22, 2019, Mr. Bush's conviction was vacated and all charges were dismissed on the grounds of newly discovered evidence of innocence by order of the Honorable Judge Senft upon the joint motion of Mr. Bush and the Office of the Suffolk County District Attorney, the same office which wrongly prosecuted him in 1975.  The District Attorney's motion also included the office's findings of serious Brady violations and a wholesale disregard for the constitutional rights of Mr. Bush.

10. On the basis of a year-long investigation the newly formed Conviction Integrity Bureau (CIB) of the Suffolk County District Attorney's Office concluded Mr. Keith Bush was

actually innocent based on newly discovered evidence, including:  DNA test results of

biological material recovered from under the victim's fingernails, discovery of the likely

murderer, John Jones, a man who was known to Defendant Detectives but whose likely

responsibility for the murder was deliberately minimized and suppressed to cover up the

Detectives' own mis-conduct, new evidence confirming the brutality used by the Defendant

Detectives against Mr. Bush, new evidence confirming Defendant Detectives' illegal

coercion of teenaged witnesses, and new scientific evidence proving that false and

unscientific forensic evidence had been used against Mr. Bush at trial.

11. Mr. Bush did nothing to cause or bring about his wrongful conviction. This grave miscarriage

of justice was the direct result of egregious misconduct, recklessness and gross negligence by

the Defendant officers of the Suffolk County Police Department ("SCPD"), and by a doctor

from the Suffolk County Medical Examiner's office working in tandem with the SCPD.

12. Beyond compensating Mr. Bush for the beating he endured, and the decades of his life lost,

and his future suffering all due to the misconduct, recklessness and gross negligence  of the

individual Defendants, this action seeks findings concerning the unlawful Suffolk County

policies, practices or customs, extant in 1975,  of conducting unlawful interrogations and

investigations and failing to adequately train, supervise and discipline its officers that led

Defendants to violate his constitutional rights as guaranteed by the First, Fourth, Fifth, Sixth,

Eighth and Fourteenth Amendments of the United States Constitution.

### JURISDICTION

13. This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims

arising under 42 U.S.C. § 1983.

14. Supplemental jurisdiction over Plaintiff's pendant state law claims exists pursuant to 28 U.S.C. § 1367(a).

15. Plaintiff made and timely served a notice of claim on the County of Suffolk as required by New York General Municipal Law Section 50-e.

16. At the request of Suffolk County, Plaintiff submitted to a hearing and was examined pursuant to New York General Municipal Law Section 50-h.

**VENUE**

17. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of New York, the judicial district in which the claims arose and in which the defendants resided or conducted business in 1975.

**JURY DEMAND**

18. Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

**PARTIES**

19. Plaintiff Keith Bush was at all times relevant to this Complaint a resident of the State of New York. Plaintiff Keith Bush currently lives in Connecticut

20. Defendant Detective Dennis Rafferty, was employed by the Suffolk County Police Department in 1975 and 1976, and was at all times relevant to this Complaint a duly appointed and acting police officer of the Suffolk County Police Department ("SCPD") with the rank of Detective, acting under color of law and in his individual capacity within the

scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the County of Suffolk and State of New York.

21. Defendant Detective August Stahl was employed by the Suffolk County Police Department in 1975 and 1976, and was at all times relevant to this Complaint a duly appointed and acting police officer of the Suffolk County Police Department ("SCPD") with the rank of Detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the County of Suffolk,  State of New York.

22. Defendant Detective John (Jack) Shirvell was employed by the Suffolk County Police Department in 1975 and 1976, and was at all times relevant to this Complaint a duly appointed and acting police officer of the Suffolk County Police Department ("SCPD") with the rank of Detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Suffolk County, State of New York.

23. Defendant Detective Conrad Alt was employed by the Suffolk County Police Department in 1975 and 1976, and was at all times relevant to this Complaint a duly appointed and acting police officer of the Suffolk County Police Department ("SCPD") with the rank of Detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Suffolk County, State of New York.

24. Defendant Detective James Tohill was employed by the Suffolk County Police Department in 1975 and 1976, and was at all times relevant to this Complaint a duly appointed and acting police officer of the Suffolk County Police Department ("SCPD") with the rank of Detective,

acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Suffolk County, State of New York.

25. Defendant Detective Alan Rosenthal was employed by the Suffolk County Police Department in 1975 and 1976, and was at all times relevant to this Complaint a duly appointed and acting police officer of the Suffolk County Police Department ("SCPD") with the rank of Detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Suffolk County, State of New York.

26. Defendant Detective Sergeant Anthony Gafney was employed by the Suffolk County Police Department in 1975 and 1976, and was at all times relevant to this Complaint a duly appointed and acting police officer of the Suffolk County Police Department ("SCPD") with the rank of Detective Sergeant, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Suffolk County, State of New York.

27. Defendant Detective Edward Halverson was employed by the Suffolk County Police Department in 1975 and 1976, and was at all times relevant to this Complaint a duly appointed and acting police officer of the Suffolk County Police Department ("SCPD") with the rank of Detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Suffolk County, State of New York.

28. Defendant Detective Nicholas Severino was employed by the Suffolk County Police Department in 1975 and 1976, and was at all times relevant to this Complaint a duly

appointed and acting police officer of the Suffolk County Police Department ("SCPD") with the rank of Detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Suffolk County, State of New York.

29. Defendant Detective Lawrence Rooney was employed by the Suffolk County Police Department in 1975 and 1976, was at all times relevant to this Complaint a duly appointed and acting police officer of the Suffolk County Police Department ("SCPD") with the rank of Detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Suffolk County, State of New York.

30. Defendant Doctor Howard Adelman was at all times relevant to this Complaint a doctor employed by and employed in the service of the Suffolk County Medical Examiner's Office, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Suffolk County, State of New York.

31. Defendant Suffolk County of New York is a is a body politic and corporate empowered to exercise home rule.  The Suffolk County Legislature, the County's policymaker, has delegated final policymaking authority for the supervision and control of Suffolk County Police to the duly appointed Commissioner of the Suffolk County Police Department, currently Commissioner Geraldine Hart. In 1975-1976 the Commissioner was Eugene Kelley. Suffolk County was the employer of the individual defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Suffolk County Police Department.

## FACTUAL ALLEGATIONS

### *A Child is Killed*

32. On Friday, January 10, 1975, Pearl Jackson, a resident of Bellport, Long Island, hosted a party at her house at 735 Bourdois Avenue, in Bellport, New York.  Ms. Jackson lived in a predominantly Black neighborhood within Bellport which was small, close-knit and friendly. Teens played basketball together and attended parties at each other's homes.

33. The party at the Jackson home began at around 9:00 p.m. and approximately 75 to 100 teenagers attended over the course of the night.

34. The party lasted into the early morning hours of Saturday, January 11, 1975, ending at approximately 3:00 a.m.

35. Attendees at the party gathered both inside the Jackson home and outside on her front lawn. Older teens from surrounding villages pulled up in cars and parked outside. Some teens visited with them in the cars and some left in those cars. Jackson charged guests fifty cents for admission to the party.

36. Bartenders served alcohol and soda, and a band played music while guests talked and danced.

37. Sherese Watson, age 14, attended the party at the Jackson home. She arrived in the company of Brenda Carlos, who had promised Watson's mother that she would bring her home afterwards.

38. Watson left at approximately 1:30 a.m.

39. Soon after she left, other teenagers who were outside in the area heard a girl scream rape and call for help from the vicinity of a vacant lot approximately three blocks from the party, but they did not call the police or take action.

40. On Saturday, January 11, 1975, shortly before 8:00 a.m., Watson's mother, Sherry Young, discovered Watson had not returned home from the party.

41. Looking for her daughter, Young went to the homes of several local teenagers who were friends of Watson's and had attended the party. Unable to locate her daughter, she called the SCPD at approximately 10:00 a.m. to report Watson missing. Her call was categorized as a missing person report.

42. On Sunday, January 12, 1975, two teenagers discovered Watson's body in a field less than three blocks west of the Bourdois Avenue location of the Jackson party.  The site was on the way to Watson's home and in the vicinity of where the scream was heard.

### Police Tunnel Vision and Coercion of Witnesses

43. When police arrived at the scene, Watson's body was lying face down. Her jeans were partly unzipped. Police noted numerous puncture marks, similar in size to the prongs of a fork, on her right lower back, with minimal blood.  Police recovered a white knit hat, a black plastic comb, and an automobile antenna from the ground near her body. Defendant Detectives Dennis Shirvell and August Stahl viewed the crime scene. Defendant Detectives Shirvell, Stahl, and Rafferty became the lead Detectives on the case.

44. Crime scene officers took ground level photographs of the scene, as well as aerial shots of the neighborhood, and collected a black plastic hair comb, a white hat, and a car antenna from the scene.  A latent print of value was lifted from one of the items police collected from the crime scene.

45. Dr. Howard Adelman, one of the doctors employed by the Suffolk County Medical Examiner conducted an autopsy and determined the cause of death to be strangulation. He observed

bruising and wounds on Watson's face, and he noticed the numerous puncture wounds on the victim's back.

46. At autopsy, no rape kit was completed, but police collected fingernail scrapings from underneath Watson's fingernails.

47. On the afternoon of Sunday, January 12, 1975, Detectives, at the request of Shirvell, in charge of the investigation, spoke to neighbors and to Watson's mother. No one had seen the murder. No one knew anything about what had happened to Watson after she left the party. No one knew where she had gone. Detectives conducted a neighborhood check and attempted to obtain names of the people who attended the party.  They spoke to the victim's classmates and learned that Watson had two boyfriends. They did not contact those boys.

48. Detectives ascertained from Watson's mother that Watson attended the party with her friend, Carlos. Before the party, Watson's mother had asked Carlos to ensure that Watson returned home as she was only 14.

49. Police learned that despite Watson's mother's request, Carlos left the party without Watson.

50. Police learned that Carlos reported to Watson's mother that Watson had expressed hope that her friend, Keith Bush, would take her home.

51. That day, January 12, 1975, Defendant Detectives Shirvell and Stahl spoke to Carlos. Carlos told them that one of the people Watson introduced her to was a friend, Keith Bush. Carlos explained that when she left the party, Watson declined to leave with her. Carlos said she saw Watson speaking to Keith Bush, but she did not suggest that Bush volunteered to take Watson home.

52. On Monday January 13, 1975, Defendant Detectives Shirvell and Stahl spoke to Keith Bush in the back of the police car in front of his house.  Keith Bush was pleased to cooperate with

the police as he was very shaken up by Watson's murder and hoped to help the police solve the crime. He had been at the party and knew the victim.  Her murder was frightening to him and to the neighborhood. He believed helping the police was his civic responsibility. He was in 11th grade, smaller than most of the other boys (5'5", 126 lbs.), and less worldly when it came to police (he had never had any encounters with law enforcement previously)

53. Bush truthfully told Defendant Detectives that he observed Carlos leave the party at approximately 1:00-1:30 a.m., which was consistent with what Carlos had told them.

54. Keith Bush told Defendant Detectives that he observed Watson leave the party about ten to fifteen minutes after Carlos.  Keith Bush reported that he remained at the party until shortly after 3:00 a.m., when he left with friends. He provided the names of those friends to Defendant Detectives: Tom Davis and Junie (Allen Scruggs). He said that Kevin Brane (whose name is actually Kevin Bryant) gave him a ride home and that his friends were with him then as well.

### Defendants Coerce a Fabricated False Statement from Maxine Bell

55. Later that same day, Monday, January 13, 1975, Defendant Detective Shirvell interviewed Maxine Bell, a 15-year-old runaway in the 9th grade. Bell's foster mother had called police to locate her after hearing of Watson's murder. A missing person's report was issued. Police picked her up around 2:00 in the afternoon. They held her in custody for hours. Although her mother sent her brother to the station house with her, the police separated them and questioned her out of his presence.

56. The Defendants, wanting to quickly close their investigation, had a hunch that Keith Bush may as well have been responsible, and decided on a theory of the case that made him the killer.  All they needed was to secure evidence to support their erroneous hunch. But given

their lack of ethics, the detectives decided to manufacture evidence if it did not arise naturally.  During the interrogation of Bell, Defendants, including Defendant Detective Shirvell, falsely told Bell that they knew that Bush had killed Watson.  They told her they knew she had information.  They intentionally frightened her.  After several hours of aggressive and coercive questioning, Detectives intentionally and knowingly coerced the scared 15-year old to sign a statement they drafted. The Detectives fabricated the statement by including false details consistent with their theory of how the crime occurred. Bell was released from police custody around 7:30 in the evening.

57. The fabricated false statement that Defendant Detectives coerced Maxine Bell into signing includes concocted details consistent with the theory of the crime Detectives invented. The false statement says that Maxine Bell stood outside on the street for hours while the party was on.  The false statement includes the following false details:

    a. That Bell saw Watson and Carlos exit the party at the same time as Keith,

    b. That Watson told Carlos to leave because "Keith was going to walk me home",

    c. The she and Watson and Keith were talking outside of the Jackson house;

    d. That she saw Keith Bush leave the party with Watson, and

    e. That she saw Keith and Watson walk away from the party together going westward on Hampton avenue.

58. None of that was true.

59. In fact, Bell was in hiding the night of the Jackson party. She did not attend the party or hang around outside the house. She did not see Watson, Carlos or Keith Bush. Police fabricated those details and coerced Bell into signing a statement including those false facts to enable them to go after Bush.

60. To add verisimilitude to the false statement, police also included details which they knew were true. For example, the statement avers that Bell sat on a bright red car and saw several friends – all teens who police had already ascertained were there – such as: Brenda Carlos, Jeanette Farmer, Georgette Farmer, and Chris Foster. By that time Detectives had spoken to both Georgette and Jeanette Farmer. The Farmer sisters told police that a red car was parked outside the party.

61. Because Bell's statement was false, police intentionally took no action which would have either corroborated Bell's story or proved it to be unreliable. They did not re-interview the Farmer sisters to ascertain whether they had seen Bell, nor did they inquire whether any of the other teens youngsters who attended the party actually saw her there. They did not look at the scene to consider where a 15-year-old might have stood for multiple hours in the dark on a January night outside a party.

62. Bell has maintained since 1980, when she testified witness at a post-conviction hearing under oath, that Detectives forced her to make those statements, that she was not outside the party, that she did not see Keith Bush, Watson, Carlos or anyone who was there.

### *Police Beat and Kick a False Confession from Keith Bush*

63. Instead of conducting an actual investigation, Detectives intentionally and knowingly tortured Bush and fabricated a false "confession" from the 17-year-old.

64. On Tuesday, January 14, 1975, Patrolmen Marquez and Hoyt arrived at the home of Mr. Robert Stewart. Stewart had ingratiated himself with both the police and with neighborhood teens. He had previously contacted police to say that he knew several of the neighborhood boys, that he didn't believe any of them could have had anything to do with the crime, that he

thought police should utilize their assistance, and to arrange for a meeting between police and Mr. Bush and two of his friends.

65. Then Stewart asked the high school principal for permission to take Keith Bush out of school early so that Keith Bush could meet with police.

66. Always the cooperative good citizen, Mr. Bush left school with Mr. Stewart, and went with Stewart to Stewart's home.

67. Defendant Detectives Rafferty and Stahl asked patrolmen Marquez and Hoyt to bring Keith Bush to them at their "command post" in the 5th precinct.  By then, of course, they had obtained Bell's statement.

68. Based on the ruse that police wanted Keith Bush to look at a list of party attendees and assist in the investigation of the murder, Mr. Bush agreed to accompany police in their car to show them where certain teens lived in the neighborhood.

69. At 2:15 in the afternoon, Keith Bush left Mr. Stewart's home, alone, and in the custody of the police. Mr. Stewart and the other boys expected Mr. Bush to be returned by the police in 10 minutes. He never returned. He was not released from custody for 33 years.

70. Once in their vehicle, Patrolmen Marquez and Hoyt transported Mr. Bush to the 5th Precinct, where SCPD Homicide Division Detectives Dennis Rafferty and August Stahl began to interrogate him, in custody, about Watson's murder. Bush was never free to leave. After a while the Defendants transferred him to a windowless room at homicide headquarters in Yaphank

71. During the many hours of interrogation, Defendants kept Bush in complete isolation. And incommunicado.  His requests to call his mom on the phone were rejected.

72. Notwithstanding the isolation and coercion, for the first several hours Bush truthfully stood
    by his narrative of complete innocence. He repeated the facts in his original statement
    provided one day earlier.  He explained who he talked to at the party. He provided the names
    of his friends who were there and with whom he left. He denied leaving the party when
    Watson left or with her. He explained that he stayed at the party until 3:00 a.m. Although he
    wouldn't have known this, he was inside the party location at the party when people heard
    yells and screams for help.

73. The Defendants lied to him, falsely claimed they had compelling evidence of his guilt,
    threatened him with life in prison, and falsely promised that if he confessed, he would get
    three years probation because the Detectives knew that he didn't mean to do it.

74. They suggested that he wanted sex and killed her because she refused.

75. They showed him the hair pick collected at the crime scene. He explained that it was not his
    and told them that on the night of the Jackson party he wore his hair in braids and so did not
    carry a pick

76. Having so far failed to break Bush, Defendant Detective Rafferty and Stahl, with the
    assistance of other Suffolk County Police officers and detectives, including but not limited to
    Detectives Shirvell, Alan Rosenthal, Conrad Alt, James Tohill, Edward Halverson, and
    Detective Sergeant Gafney, knowingly and intentionally commenced to use the threat of
    physical force and when that failed, they then began to actually torture Bush: with some
    Defendants physically restraining him, and others repeatedly kicking him in the genitals and
    beating him in the head with a large book.

77.  Defendants warned him that the beatings would continue until he confessed. They told him
    they would stop only if he signed a statement which they had prepared for him. Sometimes,

the Defendants played good cop/bad cop. Some Defendants ran into the room to grab Bush while other pretended to hold them back and whispered that they "would only be able to protect him for so long."

78. Finally, after the unrelenting beating and hours of aggressive and coercive interrogation, disoriented, dizzy, hurting, head-pounding and terrified, Bush decided that the only way he could save his life was to acquiesce to the police. He began to cry and signed the statement the police wrote. He could not read what was on that statements because the police kept their hands over the papers as he signed. They also ordered him to place his initials at various places on the false confession.

79. None of the defendant officers present intervened to halt or to end the brutal beating to which Mr. Bush was being subjected.  The interrogation room in police headquarters where the beating occurred was in close proximity to the other Detectives' offices. Many of the walls did not reach the ceiling and sounds from within that room would have carried well. Defendants heard Bush's cries, heard threats, heard thuds, and saw their co-workers entering and existing the interrogation room for hours. Indeed, it appears that instead of intervening, several officers in the homicide division joined in and participated with the lead detectives in the restraint, beating and torture of Bush.

80. Not only did the Defendant Detectives, including but not limited to Detectives Shirvell, Alt, James Tohill, Edward Halverson, Alan Rosenthal, and Gafney fail to intervene but when interviewed by prosecuting attorneys, they intentionally and falsely denied seeing and hearing what they observed and heard and testified consistently with those lies.

81. The "confession' attributed to Mr. Bush contains no details that police did not already know when they started the interrogation.  Detectives Shirvell and Stahl were present at the crime

scene and observed the condition of Watson's body. They knew her pants were partly

unzipped, that her mouth was bruised and bloody, and that there were stab/puncture wounds

on her back. At least one of the Defendants, including Defendant Detective Tohill, was

present two days earlier for the January 12th autopsy and knew that she had been strangled

with two hands. In short Detectives were fully informed before talking with Mr. Bush. There

is nothing in the confession attributed to him "that only a killer could have known" but which

the police did not know.   This purported confession added nothing to police knowledge.

82. Rather than learning information from Keith Bush – who had no information to provide –
Detectives intentionally and knowingly fabricated a false theory of how they believed the
crime occurred and used the crime scene details to imbue the false statement with seeming
veracity.

83. For example, when police arrived at the crime scene, Watson was lying face down and her
pants were slightly unzipped. To add verisimilitude to the false confession and to harmonize
it with their theory of the crime, Detectives intentionally and knowingly fabricated the false
narrative that Mr. Bush tried to put his hand down the front of Watson's pants providing a
plausible explanation for the open zipper. Moreover, they intentionally and knowingly chose
vulgar words to describe this false narrative – words which they, in essence, put into Keith's
mouth. They chose words he would never have used, and which served only to bias and
prejudice the prosecutors and subsequently the jury – who would hear the false confession at
trial.

84. Detectives Shirvell and Stahl saw multiple puncture wounds on Watson's back as she lay on
the ground. They also saw a plastic hair pick next to her body. From this information, they
intentionally fabricated the gruesome detail that Keith Bush, who often wore his hair in an

afro style, stabbed the victim numerous times with his hair pick before strangling her.  Post-conviction it has been proven that the wounds were not and could not have been caused by a comb or hair pick – but at the time Detectives used that chilling detail to link Bush to the crime in their false, fabricated narrative.

85. Defendants included these non-public "details" to advance the position that the confession of guilt was reliable and thus should be believed by the jury.

86. That false narrative, chilling details, and vulgar language would later be included in Mr. Bush's pre-sentence report and relied upon by the parole board to deny his application for parole six times.

87. In addition to containing facts falsely and intentionally suggesting Bush's guilty knowledge, the statement attributed to him also explained away the utter lack of physical evidence against him – something a true perpetrator would not think to add. For example, if Bush's hair comb had caused the Watson's wounds, a serologist might have expected to find traces of her blood on the tines. Such was not the case. To explain this, Mr. Bush was alleged to have said within the text of the confession that he wiped the pick clean after stabbing the victim.

88. Moreover, Detectives intentionally and knowingly undercut Mr. Bush's possible defenses – at a time when Mr. Bush had no idea that he would be charged with murder, believed he would be going home, and had no idea that he was facing a trial, or even what a trial was.

89. When Mr. Bush first met with investigating Detectives, he told them he left the party around 3:00 a.m. with his friend Tom Davis and "Junie."  He said he was with his good friend Gary Watkins at the party.

90.  To ensure that Mr. Davis or Jimmy would not be able to testify for Mr. Bush at trial, Defendant Detectives Stahl and Rafferty included in the purported confession the false facts that Mr. Bush told Tom and Junie "if anybody asks you, I was at the party all night and never left until we all went home."

### Defendant Detectives Bully and Frighten Teen Witnesses from Providing Testimony for Keith Bush

91. Once they had their signed confession, Detectives interrogated Gary Watkins and intentionally and knowingly coerced the teenaged Watkins to sign a false statement averring that Keith told him to tell the "cops" that he was at the party all night and didn't leave with Watson.

92. To ensure that Gary Watkins would not be able to testify for Mr. Bush, Detectives, including Defendant Detective Alan Rosenthal, inserted the following in the purported confession, "On Saturday, January 11, 1975, I went to Weaver's Deli and met Gary Watkins. I told him if anyone asked him, I was at the party all night and never left."

93. Post-conviction, Gary Watkins informed the Suffolk County CIB that Mr. Bush never called him from Weaver's Deli, that he didn't speak to Mr. Bush at all during the time between the party and before Mr. Bush's arrest. He said Mr. Bush never told him to lie or to create a false alibi. It was the police who scared and threatened him into signing the false statement.

94. Detectives, whose names are not yet known, intentionally and knowingly intimidated other of Mr. Bush's friends. For example, Allen Scruggs (Junie) attended the party the night that Watson was killed. He was with Keith Bush at the party after Watson left.  Scruggs left the party with Keith Bush and he and Keith helped their friend Kevin push his car down the road. But after Keith was arrested, two Detectives stopped him as he exited Weaver's Deli and

warned him not to help Keith because "they knew he was lying" and if he came forward, they would charge him with murder.

### *Defendant Detectives Deliberately Fail to Interview Other Teens Who Could Have Corroborated Bush's Original True Statement*

95. Apart from Gary Watkins and Allen Scruggs - who police intentionally and knowingly intended to eliminate as possible witnesses for Mr. Bush - Suffolk County Homicide Detectives intentionally and deliberately failed to interview any other teens from the party or the neighborhood to see whether Bush's original statements to them - made prior to the beatings and isolation - could be corroborated. They failed to investigate that statement as they had no desire to discover he was telling the truth.

### *The Arrest and Search*

96. Immediately after Keith Bush signed the three-page police-drafted statement, witnessed by Detectives Stahl, Rafferty and Shirvell, police formally charged him for the murder and attempted sexual abuse of Watson.

97. Then, Defendants, including but not limited to Defendant Detectives Shirvell, Rosenthal, and Nicholas Severino, a detective assigned as a technician in the Suffolk County Police laboratory, executed a search warrant at Keith Bush's home in the early morning hours of January 15th, and collected clothing that they believed he wore to the party. The Detectives also intended to seize a hair pick in that search, as the existence of a hair pick was a key element of their theory of how the crime occurred. No one in the Bush house that night possessed a pick, and no one could find one in the house. Detectives told the family that they wouldn't leave without one. Finally, family members called Keith's cousin, George Gholson, who wore his hair in a large afro and he brought over his own hair pick - a metal-tined,

wooden-handled hair pick - that was later admitted into evidence at trial as the instrument

Keith Bush allegedly used to cause the puncture marks on Watson's lower back.

### Keith Bush Immediately Disavows the False "Confession" and Reports the Use of Torture

98.   As soon as Bush was brought to court for arraignment and met counsel, he immediately

repudiated the "confession" reporting to counsel that he was beaten badly and forced into

signing papers he was not even allowed to read.  He insisted that he was innocent. He did not

murder Watson.

99.   Counsel told the court at arraignment that his client was beaten and assaulted by police.

*Newsday* prominently reported the allegation.

100.     The court ordered the jail to examine Mr. Bush, but he was not taken to a civilian

hospital, and was instead inspected at the jail. Although the medical personnel noted that Mr.

Bush complained of being assaulted with a large book, being kicked and hit, and walking

with a slight limp, he found no injuries necessitating treatment.

### Post Arrest Police Investigation:

### Police Ignore Absence of Evidence Linking Keith Bush to the Murder

101.     After Bush was arrested and charged, the medical examiner's office and the police

laboratory continued to analyze evidence from the crime scene. None of that evidence linked

Bush to the Watkins' murder.

102.     Significantly, none of the forensic testing provided evidence to corroborate the

confession.  In fact, nothing in the false coerced confession was corroborated by evidence

that the police had not collected or did not know about when they started the interrogation.

For example, although Watson was stabbed close to 100 times (inflicting close to 100

puncture wounds) with a sharp instrument – supposedly while she was alive and struggling to be free, none of the clothing removed from the Bush home pursuant to the warrant contained evidence linking Bush to the murder. There was no blood or rabbit hair from Watson's rabbit fur jacket on the clothing Mr. Bush wore to the party.

103.    Although the false statement specifies that Bush replaced the hair pick into his pants pocket after the stabbing, there was no blood on the hair pick later which was introduced into trial as the weapon that inflicted the puncture wounds and no blood in or on Bush's pants pocket.

104.    The latent print lifted from the crime scene evidence was compared to Mr. Bush's fingerprints and he was excluded as the person who left the prints. Nothing at the crime scene connected Mr. Bush to Watson's murder.

105.    At the request of SCPD Detectives, Bush voluntarily provided blood and hair samples after his arrest. His fingernails were scraped in an effort to locate traces of the victim's skin. No evidence of the victim was located under his nails. His body had no visible scrapes or cuts that would suggest he had been in a recent struggle.

106.    Detective Severino, the Suffolk County Police laboratory technician who had participated in the search of Bush's home, was asked by Defendants to compare the jacket seized at Bush's home, with any fibers identified beneath the deceased's fingernails.  Severino reported to other Defendants and the prosecutor that three of the more than a dozen fibers scraped from beneath the fingernails possessed a color and composition similar to the fibers of Bush's jacket. Even in 1975, Severino knew that the observed fibers were mass produced, woven or knitted into hundreds of thousands of garments, and that scientifically he could say nothing more than that they were similar.  Instead, Severino stated falsely, knowingly

exceeding the limits of science, that Keith Bush's particular jacket was *the source, to the exclusion of all other jackets and textiles,* of the three fibers found beneath the victim's fingernails. He also failed to disclose to the prosecutor and the defense that his findings were false.

107.    At trial, ADA Sullivan argued in summation that Watson fought and struggled with her attacker before succumbing.  When the police discovered her body, the crime scene unit bagged her hands to protect whatever trace evidence might have been defensively scratched from the body of her assailant. At autopsy, the bags were removed and Dr. Adelman, as part of his standard protocol, scraped beneath the victim's fingernails in the hope of finding skin or blood from her attacker.

108.    Although Defendant Nicholas Severino's false testimony attempted to link Bush to the crime through fibers, in fact, Watson's fingernails eventually supported Bush's innocence. In 2006, the biology scraped from underneath Watson's fingernails revealed exculpatory material – a male DNA profile that excluded Bush.

### *SCPD Detectives Shirvell, Stahl and Rafferty Intentionally and Deliberately Bias the Medical Examiner and Crime Laboratory Technician*

109.    Dr. Howard Adelman conducted an autopsy on Watson on January 12th in the presence of Defendant Detective James Tohill. Adelman concluded that Watson had been strangled. He observed bruising around her mouth. He also noticed the numerous puncture wounds on her back which he described in his autopsy report, as follows:

  a.  A cluster of approximately one hundred (100) small 1/16 and 1/8") holes are found in the lumbar region just to the right of the midline. Approximately 43" above the right heel involving an area measuring 4 x4" which have a tendency to be clustered in linear groups of three. Almost no free blood is seen in the area. A small amount oozes from one of these openings.

110.    In his autopsy report, Dr. Adelman did not speculate about what instrument might have made the wounds. However, days after the autopsy, Defendants Shirvell, Stahl and Rafferty brought him the metal hair pick they seized from George Gholson three days after the autopsy and told him that Bush had confessed that the puncture wounds were made by the pick. They also informed him, as per the Detectives' theory of the case, that Bush confessed that the wounds were inflicted while Watson was alive and resisting her attacker.

111.    Dr. Adelman, despite the fact that he had on January 12th committed to describing the puncture wounds "as having a tendency to be clustered in linear groups of three",  falsely assured the Defendants and told the prosecutor that the puncture wounds were consistent with the seized metal pick which had ten metal tines/prongs of equal length. In addition to lying about the metal pick, Adelman also lied and assured them that the puncture wounds were inflicted prior to her death (consistent with Defendants' theory and the fabricated confession), when in fact, the bloodless punctures were inflicted after she was strangled.

112.    Post-conviction, Dr. Michael Baden, a noted forensic pathologist who had once served as Medical Examiner of Suffolk County, reviewed the autopsy records and determined that Gholson's pick could not have inflicted the wounds found on Watson's back in the manner described in Bush's confession. Dr. Baden concluded that the spacing of the tines on the metal hair pick was incompatible with the pattern of punctures on Watson's back. Moreover, Dr. Baden determined that the absence of bleeding from the puncture wounds shows that the wounds were inflicted after Watson's death.

113.    During the Conviction Integrity Bureau's year-long re-investigation, ADA Howard Master asked Dr. Michael J. Caplan, the current Suffolk County Chief Medical Examiner, to independently review the autopsy and crime scene records. He reached the same conclusion

as Dr. Baden:  the pick could not have caused the wounds and the wounds were not inflicted

prior to Watson's death.

114.    Dr. Howard Adelman failed to disclose to the Suffolk County District Attorney and to the

defense prior to Bush's trial that he had intentionally misrepresented the medical evidence

and that he had falsely harmonized his conclusions with the Defendant Detectives' theory of

the case.

### *False Forensic Evidence Proves the Confession is False*

115.    No evidence connected Bush to the crime because, of course, he did not commit the

crime – as the sophisticated DNA testing would later corroborate. In fact, details police

included to bolster the appearance of reliability of the coerced confession actually prove that

the confession is false, telling a false story embellished by police imagination. As the CIB

later put it:

> "The falsity of key aspects of Bush's confession leads to basic questions about the
> validity of the confession in its entirety: why would Bush lie about the manner in
> which he committed the offense of he intended to truthfully admit committing it? Why
> would the real killer get such fundamental facts of the crime wrong if he were
> involved in the offense? What would have prompted Bush to confess falsely to the
> crime? As a matter of logic and reason, such fundamental inaccuracies discredit the
> ultimate conclusion of the confession:  that Bush voluntarily admitted to being
> Watson's killer."

116.    The false details about how the crime was committed which Defendants believed to be

true when they secured Bush's signature on the confession, but later turned out to be false,

e.g. puncture wounds caused by the metal pick and the punctures were made while she

struggled before she was strangled – are compelling evidence that these false facts originated

with the detectives rather than with Bush.

### *Detectives Meet Watson's Likely Killer, Fail to Investigate and Hide His Existence*

117.    In late April 1975, three months after Mr. Bush's arrest and while he remained in jail unable to make bail and preparing his defense, Defendant Detectives Shirvell, Stahl and Rafferty were notified of the arrest of John Jones.

118.    Jones had been arrested for driving a stolen vehicle. It was his eleventh arrest. His fingerprints would have been run pursuant to that arrest. Either one of his prints was matched to the latent print found at the scene or he, for some reason, made statements tying himself to the Watson murder.

119.    On May 9, 1975, Jones provided a statement to Detective Rafferty.  In that statement, Jones claimed that he attended the party at the Jackson home, where he noticed Watson.  He became intoxicated and, while walking on his way home to his sister's house, stumbled over Watson's lifeless body, apparently losing his plastic hair pick as he fell.

120.    After falling over Watson, Jones claimed to have continued home, realizing only later that Watson was dead when he heard about it in the news.  Jones never reported the encounter with the dead girl to anyone until three months later when he was arrested on the stolen car.  Jones drew a map for police purporting to explain his route from the party to his sister's home. His sister lived due east of the party location. But Watson's body lay in the middle of a vacant lot several blocks west of the party. The body was not on his route home to his sister's home.  In fact, Watson's body was not lying in a road at all, but in the middle of an overgrown vacant lot.

121.    In 2019, the Suffolk County District Attorney's CIB, considering Jones' statement, determined that it was in all aspects implausible:

> "Jones's claim thus was that of all the possible trajectories for his travels, his trajectory
> by happenstance brought him in the opposite direction of his intended destination, off

roads entirely to a vacant lot, and moreover to the specific point in that vacant lot where Watson's body was located. So precise was his trajectory that he tripped over the body, losing his hair pick in the process."

122.   Addressing other aspects of Jones' statements, the CIB continued:

"Jones's statement went on to say that he encountered Watson's body between 1 and 1:30 a.m. When he did so, (a) he knew it was a girl, (b) he tripped, causing him to lose his plastic hair pick, (c) he continued home, not saying anything to anyone about his encounter with the girl even after she went missing, searches were conducted in the vicinity of his sister's home, and her body was later found just where he had tripped. Later he came to realize that he had recognized Watson from the party and that he had observed her leave, 'one hour ahead of me, or maybe a half/hour.' When shown a picture of the crime scene, Jones both identified what he believed was his pick next to the victim's lifeless body and stated that he recognized Watson from the party. Jones admitted to no relationship with Watson but claimed to have a specific recollection of when she left the party."

123.   As the CIB concluded: "All aspects of this portion of the statement are implausible." The CIB also learned that Jones had been charged with the felony of statutory rape in May 1975, before Bush went to trial. At the time, Jones was 21 and the girl was 15.

124.   Witnesses at the party recalled Watson leaving the party at about 1:30 a.m. Jones claims to have stumbled over her between 1:00 and 1:30. If those times were to be credited, he would have stumbled over her just after the murder – but without seeing or hearing a thing.

125.   Significantly, as the CIB explained: "[I]t is far more likely that Jones lost his hair pick through some struggle or conflict consistent with his involvement in Watson's murder rather than the story he settled on – that an item fell out of his pocket when he unluckily tripped over Watson's newly-murdered corpse in the middle of a field that was in the opposite direction of his sister's home."

126.   Finally, if Jones had no involvement with Watson's death, it is more likely that he would have told someone about his experience than keeping it a secret until he was arrested.

127.    Jones was the most likely person to have committed the murder. He admitted seeing

Watson and noticing her as she left the party. He admitted having physical contact with her.

His personal belongings were found next to her body. And, he failed to notify anybody about

what he claimed to have seen – despite the murder being front page news. His explanations

were preposterous.

128.    No information regarding Jones was ever disclosed to Bush prior to trial. Mr. Keith Bush

did not learn of Jones' existence and relation to the case until 2017.  Jones died in 2006.

Bush was deprived of an opportunity to argue that Mr. Jones was the actual perpetrator. And

the people of the County of Suffolk and the State of New York were deprived of the

opportunity locate the real perpetrator.  Jones went on to commit other crimes.

129.    Detectives Shirvell, Stahl, and Rafferty deliberately and knowingly took action designed

to minimize the importance of the material, relevant, and stunning new evidence.  Having

built a case through coerced false statements, police could not risk re-opening the

investigation without revealing that they had fabricated and coerced a confession and other

important evidence.

130.    Committed to prosecuting Bush, police failed to investigate the Jones evidence. They did

not take a photograph of Jones and circulate it to see if any of the teens who were at the party

remembered seeing him there. They did not show it to the boys who arrived at the party in a

red car to see if anyone had seen Jones lurking about outside the party. They did not visit

Jones's sister's home to ascertain at what time, if at all, he returned that night and in what

condition. They did not execute a search of the sister's home to see if his clothing contained

traces of the victim's biology. They did not interview his sister to see what she might have

noticed about his behavior that night or to learn whether he made any statements of interest. They did not even walk the route Jones described.

### *Based on Defendants' False, Fabricated and Coerced Evidence, Keith Bush is Tried, Convicted, and Sentenced to Prison*

131.    Most Defendants knew and those that didn't should have known that Bush's confession, Bell's statement, and those statements police secured from Bush's alibi witnesses were false, fabricated, and result of Defendants' own suggestion, threats, and coercion. The Defendants misrepresented these critical moments in the investigation in their communications with the prosecutor.

132.    Defendants intentionally, deliberately and wrongly withheld from both the prosecutor and from Bush's defense attorneys the fact that they:  (a) drafted the confession based on what they knew about the crime and what they believed was the manner in which the crime was committed, (b) fabricated inculpatory evidence against Bush, (c) conspired with both the medical examiner and the criminalist to falsely and unscientifically conclude that crime scene evidence supported their false theory of how the crime occurred, (d) falsely claimed that facts in the confession originated with Bush, (d) and withheld the fact that they threatened, frightened, and ultimately tortured Bush into signing the false statement that they composed.

133.    Defendants intentionally, deliberately and wrongly withheld from both the prosecutor and from Bush's defense attorneys the fact that they coerced Maxine Bell to sign a fabricated statement falsely implicating Bush.

134.    Defendants intentionally, deliberately and wrongly withheld from both the prosecutor and from Bush's defense attorneys the fact that they: (a) coerced other witnesses into signing false statements, and (b) frightened witnesses from testifying on Mr. Bush's behalf at trial.

135.   Prior to trial, Bush moved to suppress his confession on the grounds that he had been arrested without probable cause and that the interrogations were coercive. Detectives Shirvell, Rafferty and Stahl all testified falsely at his suppression hearing, consistent with their earlier reports, that Bush had volunteered non-public inculpatory facts. Detectives Shirvell, Rafferty and Stahl all testified falsely that they did not hit, kick, or threaten Mr. Bush.  Based on Defendants' perjury, Bush's motion was denied.

136.   Bush's trial commenced on March 1, 1976.

137.   At trial, the prosecution relied primarily on the following evidence:

    a. Rafferty testified that Keith Bush voluntarily confessed to the murder and attempted rape of Watson and signed a statement to that effect on January 14, 1975, which he witnessed.  Rafferty denied his coercive conduct. He denied hitting, kicking, and threatening Mr. Bush.

    b. Maxine Bell testified consistently with the statement police coerced her into making: that that she stood outside the party for over 3 and 1⁄2 hours, sitting on a red car, and saw Keith Bush and Watson walk out of the party together.  Defendant Detectives concealed their egregious misconduct in coercing this false statement from Bell and therefore the jury never learned that her testimony was false, fabricated, and fed to her by Defendants.

    c. Dr. Adelman and Detective Severino testified consistently with the false statements and misrepresentations they had previously communicated to the prosecutor

138.   Keith Bush put on a full defense:

a. Mr. Bush testified in his own defense. He told the jury that when the homicide Detectives picked him up, he had explained to the Detectives that he was innocent – just as he had the day before.  But the Detectives refused to listen and told him that he was lying, that they knew he was the killer, that they had witnesses and proof.  He told them how over the six to seven hours of interrogation he became increasingly frightened of the large imposing older white Detectives. He said that he was kicked in the groin and that the Detectives told him those kicks would prevent him from fathering children. They hit him with a large telephone-type book. They took him far away from home and kept him in a windowless basement. They wouldn't let him call his mother.  His head hurt. He became dizzy. He thought they would kill him. He told the jury that the Detectives broke down his will. He believed the only way out of the situation was to do what they wanted. He was assaulted, frightened, threatened, isolated, and terrified into signing the false statement.

b. Bush then told the jury the truth – just as he had explained it to the police initially. He stayed at the party until leaving at 3 a.m. He provided the names of the people he was with at the party, and those that he left with.

c. Mr. Bush called witnesses in his own defense who stated that he remained at the party through 3 a.m. He called witnesses who stated that they were with him after 3 a.m., when they all left the party to return home. He called witnesses who denied ever seeing Maxine Bell at the party or standing outside the party. Other witnesses testified to seeing a group of older men and women from out of town who drove to the party and hung around in a red car.

d.  Several witnesses were too afraid to testify because, as they later explained to the
Suffolk District Attorney's CIB, police had threatened them with criminal charges if
they were to testify on Bush's behalf.

139.   After trial, which included four days of deliberations – and was, at that time, the longest
deliberation in the history of Suffolk County, Keith Bush was convicted of Murder in the 2nd
Degree and Attempted Sexual Abuse in the 1st Degree. The jury consisted of eleven white
jurors and one black juror.  The court sentenced Mr. Bush to serve 20 years to life after he
continued to maintain his innocence through sentencing.

*Post-Trial Proceedings*

140.   Bush appealed his conviction and sentence on numerous grounds, including, inter alia,
the legality of the detention and subsequent interrogation that produced his confession, which
he maintained was false, coerced and without probable cause. The Appellate Division,
Second Department, granted Keith Bush a post-trial evidentiary hearing to address the
legality of that detention and interrogation on the basis of Dunaway v. New York, 442 U.S.
200 (1979), which held that custodial interrogation must be supported by probable cause, and
statements obtained in violation of this rule must be suppressed.

141.   On remand for the Dunaway hearing, the SCDAO contended that the statements of
Maxine Bell provided the probable cause necessary to support the custodial interrogation of
Keith Bush. Bell had by that time moved to Alabama to live near her husband's family and
had two children. She was 21 years old. Upon her return to Suffolk County, she informed the
SCDAO that the statements she supposedly made to the police and her subsequent trial
testimony were false – conjured up by the investigating officers themselves.  She did not

attend the party on the night of Watson's death. She did not see Watson that night. She did not see Keith Bush.

142.     In a statement that was recorded on audiotape by the SCDAO, Bell asserted that investigating Detectives told her that Keith Bush killed Watson and told her to say that she saw him leave the party with Watson. She explained that as a young teen of 15 turning 16, she could not resist the police pressure.  She felt compelled to do as they insisted, but at 21 she was old enough, and felt safe enough, to speak honestly about what had happened.

143.     At a court hearing in 1980, Bell testified in a manner consistent with her recorded statement to the SCDAO, recanting her trial testimony and insisting that she had not been at the party and had acquiesced to police pressure and adopted police assertions that she saw Keith Bush leave the party with Watson.  The same judge who had presided over the trial, disregarded the recantation, and credited her earlier statement when finding that there was probable cause to support Bush's custodial interrogation.

144.     Keith Bush spent the next thirty-two years filing a variety of direct appeals and collateral attacks on his conviction, none of which were successful, as well as FOIL requests for records and, commencing in 1999, requests for DNA testing of evidence.

### *Newly Discovered Evidence of Innocence Establishes Mr. Bush' Innocence*

145.     In 2006, upon consent of the Suffolk County District Attorney, the Suffolk County Crime Lab analyzed biological evidence scraped from underneath Watson's fingernails. The laboratory concluded that Bush was excluded as a contributor to male DNA fragments found in the fingernail scrapings.

146.    In 2008 Suffolk County laboratory testing of the plastic hair pick found at the crime scene revealed another male DNA fragment that the Crime Lab determined in 2008 could not have come from Keith Bush.

147.    In 2017 Mr. Bush commenced successful litigation to obtain the autopsy reports and the file complied by both the SCPD and SCDA in regard to the investigation and prosecution of Mr. Bush form Watson's murder.

148.    Dr. Baden reviewed the autopsy reports and compared the photographs of the wounds on Watson's body with the photograph of the hair pick that Detective Shirvell, seized and provided to Dr. Adelman. Dr. Baden explained that the pick did not cause the wounds and that the wounds were inflicted post-mortem.

149.    The files of the SCPD and the SCDA contained the never before disclosed information regarding John Jones.

150.    As a result of the new information, Keith Bush petitioned the newly formed SCDA's CIB and asked for review.

151.    A year-long investigation by the Suffolk County District Attorney's CIB concluded that John Jones is the likely perpetrator of Watson's murder, and that new evidence establishes by clear and convincing evidence that Mr. Bush is innocent.

152.    The CIB found that Detectives Rafferty, Stahl and Shirvell failed to inform Mr. Bush of the existence of Jones although they knew about him months before trial, suspected him, refused to further investigate his possible culpability, and deliberately minimized the significance of his statements. Moreover, to the extent the detectives revealed anything about Jones to the prosecutor, they intentionally limited what they communicated to him and minimized the importance so as not to derail the prosecution against Bush.

153.   In their investigation, the CIB requested that Dr. Michael J. Caplan, the Suffolk County
Chief Medical Examiner, perform an independent review of the autopsy and crime scene
records to determine (a) whether the pick introduced into evidence could have inflicted the
wounds found on Watson's back, and (b) when those wounds appear to have been inflicted.
He determined that the spacing (or periodicity) of the tines of the hair pick is significantly
greater than the periodicity of the puncture wounds.

154.   To make this determination, Dr. Caplan examined an autopsy photo of Watson, using a
ruler placed next to the puncture wounds in the autopsy photo to examine the periodicity of
the wounds and then compared that with the periocity of the tines in the pick alleged to have
caused those wounds.

155.   The distance between the outer edges of any two of the ten tines in the pick was 3/8 of an
inch. An examination of the periodicity of the wounds revealed that three punctures, not two,
appear in approximately that same spacing of approximately 3/8 of an inch. Therefore, no
more than two tines fit in the space ace of approximately 3/8 of an inch.  Additionally, he
pointed out that the pick had ten metal tines, yet the puncture wounds repeatedly appear in
clusters of three punctures with identical spacing up and along the victim's back.

156.   Second, Dr. Caplan considered whether the forensic evidence reflected in the autopsy and
crime scene photos could reveal when the puncture wounds were inflicted. As described in
the false confession and consistent with the Detectives' theory, Bush would have inflicted the
punctures antemortem, i.e., pre-strangulation, with the hair pick. That is, Watson would have
been living and breathing, and her body pumping blood through her veins, at the time her
body was stabbed repeatedly with the metal hair pick when she refused to submit to Bush's
advances. That stabbing then caused her to scream, which prompted Bush to strangle her.

157.    Dr. Caplan determined that the forensic evidence was incompatible with antemortem infliction of the wounds for two reasons. First, there was minimal to no hemorrhaging at the wound sites, which would be expected in such violently inflicted antemortem injuries.

158.    Second, the absence of blood at the wound sites and on clothing touching the wounds reflects that the wounds were inflicted immediately after she was strangled. Dr. Adelman 's crime scene notes reflect that the puncture wounds were virtually free of blood and that there was minimal associated bleeding on clothing. Crime scene photos corroborate these notes, reflecting that there was almost no blood on the inside of the white sweater that was up against Watson's body at the time she was stabbed (as reflected by the presence of puncture holes in the sweater that have the same pattern as the puncture wounds in her back). Self-evidently, if Watson's heart was actively pumping blood at the time she was stabbed dozens of times by a sharp object, including once in a manner that penetrated into her abdominal cavity, she would have started to bleed profusely from those wounds, and her white sweater would have reflected that bleeding when it was found on her body. The absence of blood on Watson 's sweater at the site of the wounds is consistent only with the conclusion that the wounds were inflicted after she was strangled, and her heart essentially had stopped pumping blood.

159.    The significance of the timing of the infliction of the wounds is that it controls the sequence of the attack and murder. The cause of Watson's death was manual strangulation, committed with enough force that the hyoid bone of the 14-year-old victim was fractured. The forensic pathology, as described above, determined the sequence of the attack to be that Watson was manually strangled by her attacker first. Subsequently, while Watson was gravely injured, near death, and in a perimortem state, the attacker violently stabbed her in

the back, causing numerous puncture wounds that did not cause bleeding because Watson's heart was no longer pumping blood. This sequence directly contradicts the sequence of events set forth in Bush's confession.

160. Because the sequence and manner of the killing described in Bush's false confession are contradicted by reliable forensic evidence, the CIB concluded that Bush's confession was demonstrably false in material respects.

161. The year-long investigation by the CIB also corroborated what Mr. Bush has always alleged: that Detectives Stahl, Rafferty, Shirvell and John Doe's, bullied Mr. Bush's witnesses into refusing to testify and coerced them into signing statements that included false information that rendered them useless as defense witnesses.

162. The year-long investigation by the CIB also confirmed that Ms. Bell's statement to the police and her later trial testimony were not true. As an initial evaluation of Bell's recantation, the CIB undertook an analysis of statements and trial testimony by every other witness who attended the January 10 party with Watson and Bush and compared it to Bell's statement and testimony. Bell's January 13 statement claimed that she arrived at the party at 10 p.m., and she stayed outside the whole night.

163. The CIB found critical aspects of Bell's trial testimony to be contradicted by other witnesses and implausible. A review of all witness statements and testimony by attendees of the party (including Bell's half-sister Sharon Holmes) reveals that not a single person saw Bell at the party, even though Bell states she remained outside the party, in the vicinity of the door in the middle of winter, for 210 to 225 minutes.

164. This includes all of the witnesses Bell had reported seeing at the party from whom the CIB has obtained contemporaneous statements or testimony; all other participants at the party

who were interviewed and provided lists of party attendees; and all witnesses who attended the party and who were interviewed by the CIB in connection with its investigation.

165.    In addition, Carlos and Foster offered testimony that contradicted Bell's statements and testimony on the timing and location of key events. Carlos, for example, described asking Watson if Watson wanted to go and being told no, but according to Carlos that conversation happened inside the house where the party took place, not outside the party, where Bell's statement alleged that it occurred.

166.    Thus, if Carlos testified truthfully about her own interactions with Watson and Bush, Bell's statement was untrue. Foster, for his part, reported going to the party and leaving well before the time in which Bell described having a conversation with him. He denied seeing Maxine Bell altogether, contradicting her statement and testimony.

167.    Bell's original account of her attendance at the party – that as a runaway who was scrounging for food, she remained outside for up to 3 hours and 45 minutes on a January night without once entering the house (e.g., to use the bathroom, warm up, or get something to drink or eat), or once encountering people whom she undisputedly knew and who would have recognized her (such as her half-sister Holmes, who would have noticed that Bell had arrived at the party after running away several days earlier) – also suffers from inherent implausibility.

168.    Thus, in the 44 years since Watson's murder, it appears that not one witness has ever corroborated Bell's statement and testimony that she was outside of the Jackson house on the night of the party. In the absence of any corroboration (and in the presence of numerous contradictions) of Bell's trial testimony, and faced with Bell's steadfast assertion since 1980 that she was pressured to lie by adopting and signing the statement police wrote for her the

police and evidence of other instances in which pressure was applied in this case, the CIB concluded that the evidence supports Bell's longstanding recantation of her statements inculpating Bush.

169.  The unconstitutional and tortious acts of the defendant officers were not isolated incidents.  Upon information and belief, there was a custom, policy, pattern and practice in Suffolk County beginning years before and continuing after the unjust conviction of Mr. Bush of condoning, encouraging, ratifying and acquiescing in the practice of failing to conduct reasonable criminal investigations, conducting unconstitutional interrogations, fabricating evidence including confessions and evidence supporting probable cause, committing perjury, failing to investigate alibi evidence, coercing confessions, failing to disclose exculpatory evidence and covering up this unconstitutional misconduct.  Upon information and belief, Suffolk County Police policymakers were on notice of, but deliberately indifferent to these unconstitutional customs, policies and practices.

170.  By the time of Mr. Bush's trial, supervisors and Suffolk County Police policymakers were on notice of, and specifically knew, that Homicide Detectives in the SCPD coerced false confessions and lied to fabricate evidence to close homicide cases.  Prior notice is made clear e.g. by the facts as reported in *People v. Singer*, 387 N.Y.S.2d 911, 913 (2d Dept. 1976) rev'd on other grounds, 44 N.Y.2d 241 (1978).  In that matter, SCPD detectives had built a circumstantial case against Mr. Singer for the murder of Eileen Byrne by 1971.  Initially, when Detectives brought their evidence to the SCDA's office, the assigned Assistant District Attorney told them it was insufficient to charge Singer.

171.  Years passed without collection of additional proof. In 1974 Police returned to the District Attorney's Office and were told to proceed on the original evidence. After bringing

Singer to their office on a ruse, Detectives arrested him for the murder and began an interrogation.  Several hours later Singer signed a confession, which he immediately claimed was beaten out of him with telephone books - instruments particularly well suited to leave no marks.

172.   In 1976 the SCPD and SCDA were alerted, in a grand jury report, that allegations of criminal misconduct against members of the Police Department had not been handled properly.  This report, entitled "Report Number II of the Second Grand Jury of the Special and Extraordinary Trial Term of the Supreme Court, "resulted from the work of a special prosecutor appointed by former Governor Nelson A. Rockefeller in the mid-1970's in response to a bitter controversy involving former District Attorney Henry O'Brien and former Police Commissioner Eugene Kelley – who was the Commission at the time of the events described in these papers.

173.   On June 11, 1979, the *National Law Journal* published a front-page article detailing a widespread practice of coercing confessions among the homicide detectives of the Suffolk County Police Department.  The article described allegations of abuse that noted a similarity in the type of torture allegedly employed by the SCPD to elicit confessions: beatings administered by telephone books used as a cushion to avoid leaving telltale bruises, as well as a startling failure to follow up on obvious leads inconsistent with a confession or to seek evidence that might corroborate or refute a confession.

174.   In response to the *National Law Journal* article the Suffolk County Bar Association conducted an extensive investigation that included public hearings.  In a report issued in January of 1980 the Bar Association found long term "serious problems" with the way Suffolk detectives conducted interrogations, the unlawful use of physical force, and a failure

to investigate complaints of misconduct internally.  It recommended, among other reforms, the videotaping of interrogations.

175.    On December 7, 1986, two *Newsday* reporters analyzed 361 Suffolk County murder cases between 1976 and 1986.  The year-long study showed that homicide detectives obtained confessions in ninety-four percent of those cases – a startling number far more than comparable detective agencies. Bush believes these excessive number were the rule prior to 1975.

176.    The *Newsday* reporters compared confession rates in six comparable counties and found confession rates between 54 and 73 percent in those jurisdictions.

177.    Not only did the investigating reporters find that the police were brutal, but they also uncovered evidence that the police brutality during interrogation induced false confessions.

178.    Newsday uncovered evidence that the SCPD persuaded 23-year-old William Rupp to sign a statement in 1976 "confessing" to beating an elderly neighbor to death with his fist.  However, a later completed autopsy concluded that the victim was strangled. Rupp was released after a month in jail, and the real killer was eventually convicted. A civil jury awarded Rupp $35,000 in damages on his claim that detectives forced him to falsely confess.  Similarly, in this case, based on their erroneous view of the murder, the homicide detectives fabricated a confession alleging the use of a hair pick to explain the stab wounds and claimed they preceded the strangulation. Years later it was determined that neither had occurred.

179.    Discussing the interrogation, William Rupp stated that he was picked up at his mother's home shortly before 8:00 p.m. and driven to the Homicide Squad offices in Hauppauge where he was questioned into the early morning hours of the next day. He claimed that police

ordered him to strip and handcuffed him naked to a chair in a filing room. During

questioning he claimed to have been punched and beaten on the head with a telephone book.

The techniques used to induce Rupp to "confess" (and Singer before him) are strikingly

similar to those that Keith Bush claimed were used to persuade him to sign the "confession."

180.     Newspapers and bar associations were not alone in criticizing Suffolk County

Police.  Approximately 10 years after Keith Bush's interrogation, the behavior of the Suffolk

County Homicide Detective Squad and, in particular, Homicide Detective Dennis Rafferty -

one of the two officers who aggressively interrogated and beat Keith Bush - triggered a major

official investigation into Suffolk County Police and prosecutorial misconduct during the

very time period Petitioner Bush was arrested and convicted.

181.     District Court Judge Stuart Namm wrote to then-Governor Cuomo and requested a full-

fledged investigation into misconduct by Suffolk homicide detectives and prosecutors arising

from what he had witnessed in cases tried before him.  In one case in particular, Suffolk

County police testified against a man named James Diaz whom homicide detectives claimed

had confessed to a brutal rape and murder. Diaz was acquitted and Namm believed that the

misconduct of Rafferty caused the wrongful acquittal.

182.     Famously in 1988, SCPD coerced the innocent Martin Tankleff to falsely confess to

murdering his parents.  Homicide detectives lied to Tankleff, falsely informing him, among

other fabrications, that his father had been miraculously revived and named him as the

murderer when no such events had occurred. It took a squadron of lawyers and investigators

20 years to exonerate Mr. Tankleff.

183.     In April 1989, the New York State Investigation Commission (SIC) issued a report

finding "grave shortcomings in the leadership and management" of the Suffolk County

Police Department, especially with respect to the conduct of its homicide detectives.  That finding included lack of accountability for official misconduct.

184.    The report further found that the Suffolk County Police Department engaged in and permitted grossly deficient investigative and management practices, and failed to punish instances of employee misconduct, even when supervisory personnel knew of those instances. The report criticized Suffolk County's over-reliance on confessions to solve crimes, and specifically accused Detective Rafferty of "providing false and/or highly suspect testimony" at trials.  The Commission was disturbed by "Rafferty's convenient talent for producing crucial testimony and evidence at the eleventh hour in homicide prosecutions." The Commission, which had no independent power to investigate or discipline, suggested that Internal Affairs should investigate Rafferty's activities. Rafferty was the only officer or prosecutor demoted as a result of the investigation.

185.    The SIC report makes clear that since "at least the mid-1970's, there have been severe and recurring public criticisms of Suffolk County law enforcement from many quarters: in decisions by the New York State Court of Appeals, in a bar association report, in news articles, and in a controversy involving a former district attorney and then police commissioner which necessitated the appointment of a special prosecutor. "

186.    Stunningly, between 1976 and 1981, the New York Supreme Court, Appellate Division, reversed ten Suffolk County murder convictions because homicide detectives used illegal tactics to elicit confessions. Detectives Rafferty and Halverson played major roles in eliciting the questioned confessions in many of those cases.

187.    The findings of the SIC explained in the most forceful terms possible that the Suffolk County homicide division was being allowed to persist in a custom, policy, and practice of

coercing confessions, lying to cover up the coercion, and failing to investigate obvious leads because they had the confession.

188.    The key point was that unchecked use of these tactics would inevitably lead to the conviction of an innocent – which is exactly what happened to Keith Bush.

189.    The conduct and practice of the Suffolk County Detectives did not stop after publication of the report.

190.    In 1992 Defendant Sal Inghilleri claimed to have falsely confessed to a crime after Detective Dennis Rafferty threatened to jail him on high bail. Inghilleri claimed that Rafferty kept a piece of paper over the text of the statement so that all he could see was the blank space for his signature.  Rafferty used the same techniques in this case seventeen years earlier.

191.    These reports and investigations uncovered a clear pattern of unethical conduct practiced by Detective Rafferty and other detectives in the SCPD. This conduct existed prior to Keith Bush's wrongful arrest.  Policy makers were on notice of this behavior prior to 1975. There is no reason to believe that this gross departure from legal and just methods of investigation began suddenly in 1974 instead of the much more likely reality that these methods were entrenched and known about years before Bush was beaten.  Without knowing which techniques, the detectives used in these documented cases, Keith Bush raised allegations mirroring allegations raised by others both before and after him.

192.    The Suffolk County Police Department, and its policymakers, as well as the individual supervisors in this case, failed to train or supervise investigators to ensure they complied with constitutional requirements in eliciting confessions, disclosing favorable evidence to

prosecutors, and obtaining probable cause for arrest and for prosecution, and that they did not fabricate evidence or commit perjury.

193.    The Suffolk County Police Department, through its final policymakers, failed to adequately screen, supervise, and/or discipline detectives, officers, and investigators who engaged in illegal or unconstitutional conduct.  Bush's wrongful conviction and continued wrongful imprisonment was not the work of rogue, low-level officers in the Suffolk County Police Department. The detectives responsible for this miscarriage of justice were experienced homicide detectives who have unconscionably used these same tactics on other men both before and after Mr. Bush.

## Conclusion

194.    Keith Bush was convicted because of a confluence of unconstitutional and tortious behavior by Suffolk County Police and the Suffolk County Medical Examiner. These government actors, acting individually and in concert, brought about the malicious prosecution of Mr. Bush, prevented Mr. Bush from having a fair trial, and directly caused his wrongful conviction and incarceration.

## DAMAGES

195.    Keith Bush spent a staggering thirty-three years incarcerated, and forty-four years wrongly convicted before he was exonerated.  He was unjustly jailed as a seventeen-year old teenager who had no prior conflicts with the law, and not exonerated until age sixty-two. Bush was falsely labeled a sex offender, exacerbating the brutality of his imprisonment and denied assignments and opportunities available to other prisoners. He was turned down by

the parole board 6 times because he steadfastly declined to admit to crimes he did not commit. Finally paroled in 2007, he had to endure the surveillance and restrictions for another 12 years as a level 3 sex offender on parole. He was violated and returned to prison for 8 months for having the audacity to use a computer (not the internet) to document his wrongful conviction.

196.    As a direct and proximate result of Defendants' actions and omissions and the policies, practices and procedures of Suffolk County, Keith Bush sustained injuries and damages, including loss of his freedom for more than 32 years, loss of the most productive years of his adult life, physical pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

197.    Moreover, Keith Bush sustained injuries, growing old in prison without ever experiencing a free middle age. He prematurely developed the physical ailments associated with advancing age and accumulated stress years before they should have developed and all of which continue to cause anxiety, high blood pressure, and suffering to his day. In addition he suffered physical abuse by other prisoners as a result of the category of crime for which he was convicted – all of which were actually and proximately caused by the defendants' actions, errors, or omissions—including not only their initial investigatory misconduct but their constitutional failures in post-conviction years leading to Bush's continued wrongful imprisonment.

198.    Even if the County of Suffolk and/or individual defendants may not have expected or intended to continue to imprison an innocent man or cause these grave injuries, defendants are nonetheless legally responsible under 42 U.S.C. § 1983 because these injuries are the foreseeable result of the defendants' intentional misconduct, recklessness, negligence, or deliberate indifference to Mr. Bush's rights.

199.    All of the acts and omissions committed by individual Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, and with bad faith, and said acts meet all of the requirements for imposition of punitive damages.

**CLAIMS FOR RELIEF**
**FEDERAL CAUSES OF ACTION**
**COUNT I**
**42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments**
***Against All Defendants***

200.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

201.    Defendants Shirvell, Stahl, Rafferty, Severino, Rosenthal, Rooney, Gafney and Adelman, aided and assisted by other Defendant Detective members of the SCPD Homicide Detective Squad, including but not limited to: Conrad Alt, James Tohill, Edward Halverson, and John Doe police officers, acting individually and in concert, with malice and knowing that probable cause did not exist to prosecute Keith Bush for the sexual assault and murder of Watson, intentionally caused the factually innocent Bush to be arrested, charged, and prosecuted for those crimes, thereby violating Bush's clearly established right, under the Fourth and Fourteenth Amendments to the U.S. Constitution, to be free of prosecution absent probable cause.

202.    Specifically, as described in detail above, Defendants Shirvell, Stahl, Rafferty, Rooney, Severino and Rosenthal aided and assisted by other Detectives members of the SCPD Homicide Detective Squad, including but not limited to: Conrad Alt, James Tohill, Edward Halverson, Anthony Gafney and John Doe police officers, acting individually and in concert, fabricated a confession attributed to Mr. Bush, fabricated witness evidence, and fabricated forensic evidence; coerced a confession, coerced other witnesses to offer false inculpatory evidence and still other witnesses to decline to come forward with exculpatory evidence; and intentionally withheld and misrepresented exculpatory facts that they knew would have vitiated probable cause against Bush and would have impeached witnesses for the prosecution at trial.

203.    These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to the culpability of John Jones and away from Keith Bush.

204.    With Bush's exoneration in 2019, the prosecution ultimately terminated in his favor.

205.    Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Bush's clearly established constitutional rights. No reasonable officer in 1975 would have believed this conduct was lawful.

206.    The acts and omissions by Defendants described in the preceding paragraphs were the direct and proximate cause of Bush's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Bush.

## COUNT II

**42 U.S.C. § 1983 claim for Deprivation of Liberty Without Due Process of Law and Violation of Right to a Fair Trial, Under the Fourteenth Amendment, based on the fabrication of false and fabricated evidence, including false and fabricated confessions**

### *Against All Defendants*

207.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

208.    Defendants, including Shirvell, Rafferty, Stahl, Severino, Rooney, Rosenthal, Alt, Gafney, Tohill, Halverson and Adelman fabricated false evidence of Bush's guilt, thereby violating Bush's right to a fair trial and causing him to be deprived of his liberty without due process of law.

209.    As described in greater detail above, Defendants fabricated evidence in a number of ways prior to trial, and they did so knowingly or in reckless disregard for the truth. The fabricated evidence was used to arrest Bush, to prosecute him, and was the basis for the jury's guilty verdict.

210.    Defendants, individually and in concert, used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. For example, and without limitation, Defendants used torture, threats, lies, and false promises in order to coerce Bush to sign a purported confession, prepared and fabricated by the Defendants without his participation, which falsely attributed to Bush statements he never made.

211.    Defendants, individually and in concert, deliberately fabricated the witness statement of Maxine Bell through coercion, manipulation, and threats.

212.   Defendant Adelman fabricated evidence, falsely claiming that a hair pick collected from
Mr. Bush's home matched a series of puncture wounds on the deceased and fabricated the
conclusion that the puncture injuries were inflicted prior to her strangulation

213.   Defendant Severino fabricated evidence, falsely claiming that three of the many fibers
found beneath the deceased's fingernails came from the generic jacket belonging to Bush, to
the exclusion of all other possible garments.

214.   Defendants, individually and in concert, continued their investigation of Bush despite the
fact that they knew or should have known that he was innocent based on the evidence
collected from the crime scene and from the evidence connecting John Jones to the
commission of the crime.

215.   Evidence of Defendants' misconduct could have been used to undermine key evidence
relied on by Defendants in this investigation. Had it been disclosed, it could have been used
at trial to impeach Defendants and witnesses at trial as well as the quality of the entire
investigation. Indeed, had the truth of Defendants' torture and other coercion of Bush came
to the timely attention of the Suffolk County District Attorney, in all probability, the
prosecution of Bush would not have gone forward.

216.   Defendants' actions, individually and cumulatively, played a direct and decisive role in
the jury's guilty verdict and were highly prejudicial to Bush's defense. Had Defendants not
engaged in such misconduct or had their misconduct been disclosed, the evidence would
have tended to prove Bush's innocence, cast doubt on the entire police investigation and
prosecution, and most likely would have created a different result at trial.

217.   The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by
evil motive or intent, done in bad faith, and/or involved callous indifference to Bush's

federally protected rights. These acts were perpetrated while Defendants were acting under color of state law and in their capacities as employees or agents of the County of Suffolk.

218.    As a direct and proximate result of Defendants' actions, Bush was wrongly arrested, detained, charged with murder and sexual assault, prosecuted, convicted, sentenced to life in prison.

## COUNT III

### 42 U.S.C. § 1983 claim for Deprivation of Liberty Without Due Process of Law and Violation of Right to a Fair Trial, Under the Fourteenth Amendment, based on withholding exculpatory evidence from the prosecution and defense

*Against Defendants Stahl, Rafferty, Shirvell, Rosenthal, Alt, Gafney, Tohill, Halverson, Adelman, Severino, Rooney, John Does 1-5*

219.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

220.    Defendants, including Stahl, Rafferty, Rosenthal, Alt, Gafney, Tohill, Halverson, Adelman, Shirvell, Rooney and Severino withheld exculpatory evidence from the prosecution and defense, thereby violating the Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

221.    Defendants individually and in concert, in an effort to secure Bush's conviction without regard to his actual innocence, suppressed material, exculpatory and impeachment information from Bush, his defense counsel, and the prosecution in violation of the Constitution and *Brady v. Maryland*, including but not limited to the following:

222.    Defendants, individually and in concert, failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose evidence of their own misconduct during the investigation, including the use of fabricated, coercive and abusive investigative techniques.

223.   Defendants withheld from the prosecution and defense that Defendants had tortured and coerced Bush in order to make him sign a false and fabricated confession.

224.   Defendants, individually and in concert, failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose the true circumstances of Maxine Bell's statements.

225.   Defendants, including Rooney, individually and in concert, failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose that when Keith Bush's rolled fingerprint impressions taken at booking, were subsequently compared to a usable latent recovered at the crime scene, Mr. Bush was excluded.

226.   Defendant Adelman, individually and in concert, failed to memorialize, suppressed, and/or recklessly failed to disclose that the hair pick seized during the execution of the search warrant could not have made the puncture wounds on the back of the deceased; nor could the injuries have been inflicted prior to her strangulation.

227.   Severino, the Detective who conducted the fiber analysis, individually and in concert, failed to memorialize, suppressed, and/or recklessly failed to disclose that as a matter of science he could not conclude that among the many fibers collected beneath the deceased's fingernails, there were three that had as their source, a generic jacket belonging to Bush.

228.   Evidence of Defendants' misconduct and the false misrepresentations of the pathologist and SCPD Detective who testified about fibers, could have been used to undermine key evidence relied on by Defendants in this investigation. Had it been disclosed, it could have been used at trial to impeach Defendants and witnesses as well as the quality of the entire investigation.

229.   Defendants' actions, individually and cumulatively, played a direct and decisive role in the jury's guilty verdict and were highly prejudicial to Bush's defense. Had Defendants not

engaged in such misconduct or had their misconduct been disclosed, the evidence would have tended to prove Bush's innocence, cast doubt on the entire police investigation and prosecution, and most likely would have created a different result at trial.

230.    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Bush's federally protected rights. These acts were perpetrated while Defendants were acting under color of state law and in their capacities as employees or agents of the County of Suffolk.

231.    As a direct and proximate result of Defendants' actions, Bush was wrongly arrested, detained, charged with murder, prosecuted, convicted, and sentenced to life in prison.


## COUNT IV

**42 U.S.C. § 1983 Claim for Violation of the Right Against Self-Incrimination in Violation of the Fifth and Fourteenth Amendment**
***Against Defendants Stahl, Rafferty, Shirvell, and John Does 1-5***


232.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

233.    Although Bush had nothing to do with Ms. Watson's murder, Defendants Shirvell, Stahl, and Rafferty among other officers of the SCPD Homicide Detectives Squad and John Doe police officers repeatedly tortured, threatened, and lied to Bush in order to coerce him into signing a purported confession the Defendants alone drafted, in violation of his Fifth and Fourteenth Amendment rights.

234.    These coercive interrogation techniques shock the conscience and violate the decencies of civilized conduct. By interrogating Bush in this manner and doing nothing subsequent to stop the violation, Defendants set in motion a series of acts by others which they knew or

reasonably should have known would cause these statements to be used against Bush at trial, thereby inflicting constitutional injury.

235.    As a direct and proximate result of Defendants' actions, Bush was wrongly arrested, detained, charged with murder, prosecuted, convicted, and sentenced to life in prison.

## COUNT V
## 42 U.S.C. § 1983 Failure to Intervene

### *Against Defendants Shirvell, Stahl, Rafferty, Rosenthal, Alt, Gafney, Tohill and Halverson, and John Does 1-5*

236.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

237.    By their conduct and under color of state law, Defendants Shirvell, Stahl, Rafferty, Rosenthal, Alt, Tohill, Gafney, and Halverson, among other officers of the SCPD Homicide Detectives Squad and John Doe police officers, acting within the scope of their employment, had opportunities to intervene on behalf of Bush, in particular, during and immediately after the vicious beating Bush endured at Homicide Headquarters, to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

238.    These Defendants' failures to intervene violated Bush's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourteenth Amendment. No reasonable police at the times relevant to this complaint would have believed that failing to intervene to prevent these Defendants from fabricating inculpatory evidence, including the beating of Bush to secure his signature on a false confession,  or causing Bush to be arrested and prosecuted without probable cause, were lawful. Nor is there any excuse for not intervening with the prosecution once the identity of John Jones and the significant evidence connecting him to the crime became known.

239.    These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Bush's injuries. Defendants knew, or should have known, that their conduct would result in Keith Bush's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT VI**
**42 U.S.C. § 1983 Civil Rights Conspiracy**

*Against All Defendants*

240.    Plaintiff hereby incorporates by reference all the foregoing paragraphs.

241.    Defendants Shirvell, Stahl, Rafferty, Rosenthal, Alt, Tohill, Gafney, and Halverson. Rooney, Severino, among other officers of the SCPD Homicide Detectives Squad and John Doe police officers along with Defendant Adelman, acting within the scope of their employment and under color of state law, agreed among themselves and with others, to act in concert in order to deprive Bush of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, coercion, fabrication of evidence, torture, deprivation of liberty without due process of law, and to a fair trial, as well as depriving him of his First and Fourteenth Amendment rights of access to courts.

242.    In furtherance of the conspiracy, each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

   a.   Defendants Stahl, Rafferty, Shirvell and John Doe 1-5 acted in concert to coerce and fabricate statements from Maxine Bell, to coerce and fabricate a confession falsely attributed to Bush, and to intimidate Mr. Bush's alibi witnesses;
   b.   Defendant Adelman acted in concert w the lead detectives to fabricate evidence that a particular hair pick attributed to Bush caused the puncture wounds on the deceased and that the injuries were inflicted before she was strangled.

      c.  Defendant Severino acted in concert with the lead detectives to fabricate evidence that three of the many fibers recovered from the deceased's fingernails came from Bush's generic jacket.

243.    As a direct and proximate result of Defendants' actions, Bush was wrongfully convicted and imprisoned and suffered the other grievous damages and injuries set forth above.

### COUNT VII
### 42 U.S.C. § 1983 Inadequate Investigation in Violation of the Fourteenth Amendment Due Process Right to a Fair Trial

#### *Against Defendants Stahl, Rafferty, Shirvell and John Does 1-5*

244.    Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

245.    Defendants Shirvell, Stahl, and Rafferty among other officers of the SCPD Homicide Detectives Squad and John Doe police officers 1-5, while acting under color of law, conducted a constitutionally inadequate investigation in violation of Bush's Fourteenth Amendment Due Process right to a fair trial by failing to conduct a follow-up investigation of the likely true perpetrator, John Jones.

246.    In April 1975, just four months after the Watson murder, John Jones is arrested in Suffolk County on the charge of unauthorized use of a vehicle. But when his prints match a latent lifted from the Watson crime scene, he is asked by one or more Defendants to explain. The Defendants fail to conduct any follow-up investigation despite the obvious false exculpatory nature of Jones' post hoc explanations for why his plastic hair pick was found next to Watson's body in a field , for why he tripped over the dead girl and resumed running without ever reporting seeing "the dead girl" to anyone, for why after learning she had been killed, he continued to conceal his encounter for four months and revealed it only after being

confronted by Defendants with evidence of his presence at the scene of the Watson murder, for why if he had been at the party and was on his way to his sister's house (due east of the party), he was running through a field due west of the party when he tripped over the lifeless Watson. As explained more thoroughly and articulately by Assistant District Attorney Howard S. Master in his affidavit in support of Keith Bush's vacatur, the cumulative evidence, including Jones's absurd narrative of how he tripped over Watson's body and dropped his hair pick, his lengthy criminal record, the fact that he resided 25 miles away from where he says he was running, the fact that Jones, age 21, had been arrested in February 1975 for the statutory rape of a fifteen year old girl, and the fact that no one who had been at the party asked to list the attendees, included Jones or his likeness on their lists, warranted the inference that it was more likely that Jones dropped his hair pick while struggling and eventually murdering Ms. Watson. But since Jones died in 2006, it is too late to interview him again. The Defendants never even checked out his claim that he attended the party with any of the people they interviewed. Absolutely nothing he stated to the Defendants was ever corroborated by a single witness.

247.    The reason Defendants never continued to investigate Jones is because they were already committed, due to their extensive misconduct, to prosecuting the innocent Mr. Bush. To further investigate Jones would have revealed to everyone their outrageous misconduct.

248.    The constitutional source of the violations and obligations asserted herein is the due process clause of the Fifth and Fourteenth Amendments. Plaintiff brings this claim as both a procedural and a substantive due process violation.

249.    The actions and omissions of the Defendants caused Bush to be wrongly arrested, detained, charged with murder, prosecuted, convicted, sentenced to life and incarcerated.

## COUNT VIII
### 42 U.S.C. § 1983 *Monell* Claim

### *Against Defendant Suffolk County*

250.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

251.    Defendant County of Suffolk was at all times relevant to this Complaint responsible for the policies, practices, and customs of the County of Suffolk Police Department.

252.    Defendant County of Suffolk, by and through its final policymakers, had in force and effect during the Watson murder investigation and for years beforehand and long afterward, a policy, practice, or custom of unconstitutional misconduct in serious felony investigations, including but not limited to the encouragement and use of, and reliance on, suggestive and/or coercive and/or physically abusive techniques during interviews and interrogations to obtain false statements and confessions, and/or witness statements that law enforcement knew or should have known were false, the fabrication of inculpatory evidence, the suppression of exculpatory and/or impeachment evidence, and the intentional failure to conduct adequate investigations of crimes.

253.    The County of Suffolk, by and through its policymakers, created and maintained a custom, policy, or practice of failing to train, supervise, or discipline its employees and agents, including Defendants, regarding constitutionally proper investigation procedures, including but not limited to interrogation procedures.

254.    The County of Suffolk, by and through its policymakers, created and maintained a custom, policy, or practice of failing to train, supervise, or discipline its employees and agents, including Defendants, regarding their obligations to document and disclose exculpatory evidence pursuant to their Brady obligations.

255.    The unconstitutional customs, policies, patterns, and practices of the County of Suffolk have caused individuals, other than Bush himself, to be prosecuted or convicted on the basis of false and fabricated evidence, including but not limited to Singer.

256.    Bush's wrongful arrest, confinement, prosecution, trial, conviction, incarceration, and other injuries as set forth above were caused by the unconstitutional policies, practices, and customs of the County of Suffolk.

## STATE LAW CLAIMS

### COUNT IX
### Malicious Prosecution under New York State law
### *Against All Defendants*

257.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

258.    Defendants Shirvell, Stahl, Rafferty, Rosenthal, Alt, Tohill, Gafney, Rooney, Severino and Halverson among other officers of the SCPD Homicide Detectives Squad and John Doe police officers initiated or continued proceedings against Bush without probable cause and with malice. Specifically, they intentionally and knowingly deliberately misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury that vitiated probable cause, including but not limited to the facts that the physical torture and coercion produced the false confession and the coercive misconduct produced fabricated incriminating witness statements and intimidated legitimate alibi witnesses. The proceedings ultimately terminated in Bush's favor on May 22, 2019 when the court vacated his conviction and dismissed all charges.

259.    Defendants committed these acts within the scope of their employment.

260.    As a direct and proximate result of this malicious prosecution, Bush sustained the injuries set forth above.

**COUNT X**
**Intentional or Reckless Infliction of Emotional Distress under New York State law**
*Against All Defendants*

261.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

262.    Defendants Shirvell, Stahl, Rafferty, Rosenthal, Alt, Tohill, Gafney, Rooney, Severino,

and Halverson among other officers of the SCPD Homicide Detectives Squad and John Doe

police officers 1-5 intentionally and/or recklessly, and in breach of their duties owed to Bush,

directly and proximately caused Bush, an innocent man, to be falsely arrested, maliciously

prosecuted, and wrongly imprisoned for more than three decades.

263.    Defendants caused Bush to suffer physical harm, including physical ailments resulting

from the circumstances and duration of his wrongful incarceration, and to fear for his

physical safety throughout the period of his pretrial and postconviction incarceration.

**COUNT XI**
**Negligent Infliction of Emotional Distress under New York State law**
*Against All Defendants*

264.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

265.    Defendants Shirvell, Stahl, Rafferty, Rosenthal, Alt, Tohill, Gafney, Rooney, Severino

and Halverson among other officers of the SCPD Homicide Detectives Squad and John Doe

police officers 1-5 negligently and grossly negligently, and in breach of their duties owed to

Bush, directly and proximately caused Bush, an innocent man, to be falsely arrested,

maliciously prosecuted, and wrongly imprisoned for more than nineteen years.

266.    Defendants caused Bush to suffer physical harm, including physical ailments resulting

from the circumstances and duration of his wrongful incarceration, and to fear for his

physical safety throughout the period of his pretrial and postconviction incarceration.

## COUNT X
### Respondeat Superior Liability Against Defendant Suffolk County

267.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

268.   Individual Defendants were at all times material to this complaint employees of Suffolk

County, most were employees of the Suffolk County Police, and every Defendant acted

within the scope of his employment in committing the misconduct described above.

269.   Defendants' tortious conduct was undertaken while carrying out routine investigative

functions. The conduct was reasonably expected by, and in fact foreseen by, Defendants'

employer.

270.   Defendant Suffolk County is liable as principal for all intentional torts committed by its

agents.

**WHEREFORE**, Plaintiff Keith Bush prays as follows:

1.   That the Court award compensatory damages to Plaintiff and against all Defendants,

jointly and severally, in an amount to be determined at trial;

2.   That the Court award punitive damages to Plaintiff, and against all individual

Defendants in their individual capacity, in an amount to be determined at trial, that

will deter such conduct by Defendants in the future;

3.   For a trial by jury;

4.   For pre-judgment and post-judgment interest and recovery of Plaintiff's costs,

including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C.

§1983 claims; and

5.    For any and all other relief to which Plaintiff may be entitled. Respectfully

submitted,

August 14, 2020

Adele Bernhard (AB0139)
14 Remsen St.
Brooklyn, NY 110201
917-648-4035
adelezip@gmail.com